**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Hayley A. Reynolds (State Bar No. 306427)
  hayley@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 336-6545
Facsimile:  (415) 449-6469

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| TRACY HOWARD, ERI NOGUCHI, and SCOTT DIAS, on behalf of themselves and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GERBER PRODUCTS COMPANY,<br><br>Defendant. | Case No.: 3:22-cv-04779<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW; FAL; COMMON LAW FRAUD; CONSUMERS LEGAL REMEDIES ACT; AND UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

## I.   **INTRODUCTION**

1.    Plaintiffs Tracy Howard, Eri Noguchi, and Scott Dias, by and through their counsel, bring this class action against Defendant Gerber Products Company d/b/a Gerber ("Defendant") to seek redress for Defendant's deceptive and unlawful practices in labeling and marketing the Gerber brand baby and toddler food products.

2.    Consumers are increasingly aware of the need to provide healthy food for children that promotes physical development, especially at the critical age of less than 2 years old.

3.    Intending to profit from parents' increasing desire to purchase healthy food for their young children, Defendant misbrands its baby and toddler food products by unlawfully making nutrient content claims on the product packages that are strictly prohibited by the Food and Drug Administration ("FDA"). Moreover, the claims on Defendant's products mislead purchasers into believing that the products are healthy for children under two years of age in order to induce parents into purchasing Defendant's products. In fact, the Products are harmful both nutritionally and developmentally for children under two.

4.    Defendant's unlawful and misleading labeling caused Plaintiffs and members of the class to pay a price premium for the products.

## II.   **PARTIES**

5.    Tracy Howard is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Redwood City, California. Plaintiff intends to remain in Redwood City and makes her permanent home in Redwood City, California.

6.    Eri Noguchi is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Tracy, California. Plaintiff intends to remain in Tracy and makes her permanent home in Tracy, California.

7.    Scott Dias is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Lewiston, California. Plaintiff intends to remain in Lewiston and makes his permanent home in Lewiston, California.

8.      Defendant Gerber Products Company, is a privately held corporation existing under the laws of the State of Michigan, having its principal place of business in Fremont, Michigan.

### III.      JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

10.      The injuries, damages and/or harm upon which this action is based, occurred, or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products provided to persons in the State of California. Defendant has engaged, and continue to engage, in substantial and continuous business practices in the State of California.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

12.      In accordance with California Civil Code Section 1780(d), Plaintiff Howard concurrently files herewith a declaration establishing that, at various times throughout the class period, she purchased Gerber Products in Mountain View and Redwood City, California. Plaintiff Howard's declaration is attached hereto as Exhibit B.

13.      Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

### IV.      SUBSTANTIVE ALLEGATIONS

14.      Defendant manufactures, distributes, markets, advertises, and sells a variety of baby and toddler food products under the brand name "Gerber." Many of these products have packaging that predominately, uniformly, and consistently make nutrient content claims on the principal display panel of the product labels (the "Products"). A non-exhaustive list of the Products and the express and implied nutrient content claims made on the product packages is attached hereto as **Exhibit A**.

15.    The Products are intended for children under the age of two. The Products are labeled with the intended age for each Product on the front label. For example, most of the Products, including the Grow Strong pouches, are labeled as being for ages "Toddler 12+ Months." Some Products also include the word "baby" in the product name, such as the "Snacks for Baby Wonderfoods" which are labeled as being for ages "Crawler 10+ Months." Other Products are labeled as being for a "Sitter." Defendant's website defines a "sitter" to be a child between 6-8 months.

16.    The Products all feature a prominent photo of a young baby's face on the front label.

17.    Many of the Products are baby food "pouches." These pouches that contain pureed baby food were introduced to the market over a decade ago, and as of 2018, accounted for 25 percent of baby food sales in the United States.

18.    FDA regulations explicitly prohibit certain nutrient content claims on foods intended for children under the age of two. 21 C.F.R. § 101.13(b)(3).

19.    An ever-growing industry, there is seemingly no limit to the combination of foods that can go into baby food pouches, as evidenced by the wide array of flavors of the Products. Looking for a way to differentiate itself in the growing market, Defendant has turned to making nutrient content claims on the front of the Product labels.

20.     For example, one line of the Products are pouches called "Plant-tastic" that state on the front label, "2 grams of plant protein" and on the back label, "Nutritious, plant-based, and specially designed to provide 2 grams of protein." Exemplars are shown below:



21.     As described in detail below and in Exhibit A, Defendant's advertising and labeling of the Products with nutrient content claims is unlawful, misleading, deceptive, and intended to induce consumers to purchase the Products at a premium price. These claims deceive and mislead reasonable consumers into believing that the Products provide physical health benefits for their child and/or grandchildren when in fact, the Products are harmful for children under two both nutritionally and developmentally.

**Federal and State Regulations Governing Food Labeling**

22.     The Food and Drug Administration regulates nutrition content labeling. According to these regulations, "no nutrient content claims may be made on food intended specifically for use by infants and children less than 2 years of age," subject to certain exceptions not applicable here. 21 C.F.R. § 101.13(b)(3).

23.     According to the regulations, nutrient content claims can be expressed or implied. 21 C.F.R. § 101.13(b)(1), 21 C.F.R. § 101.13(b)(2).

24.     An express nutrient content claim is "any direct statement about the level (or range) of a nutrient in the food." 21 C.F.R. § 101.13(b)(1). Further, where information that is

required or permitted to be "declared in nutrition labeling, and that appears as part of the nutrition label . . . is declared elsewhere on the label or in labeling, it is a nutrient content claim and is subject to the requirements for nutrient content claims." 21 C.F.R. § 101.13(b)(1).

25.     An implied nutrient content claim is any claim that: "(i) Describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (e.g., "high in oat bran"); or (ii) Suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (e.g., "healthy, contains 3 grams (g) of fat")." 21 C.F.R. § 1013(b)(2).

26.     Identical federal and California laws regulate the content of labels on packaged food and require truthful, accurate information on the labels of packaged foods. The requirements of the federal Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations, including those set forth in 21 C.F.R. § 101, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). The federal laws and regulations discussed herein are applicable nationwide to all sales of packaged food products. Additionally, no state imposes different requirements on labeling of packaged food for sale in the United States.

27.     California's adoption of food regulations that are identical to the federal regulations stems from the state's "historic police powers" to regulate food labeling, which long-predates the enactment of the FDCA. *See Plumley v. Massachusetts,* 155 U.S. 461, 472 (1894) ("if there be any subject over which it would seem the states ought to have plenary control, and the power to legislate in respect to which … it is the protection of the people against fraud and deception in the sale of food products."); *see* also *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 144 (1963) ("States have always possessed a legitimate interest in 'the protection of (their) people against fraud and deception in the sale of food products' at retail markets within their borders.") (citation omitted).

28.     Although California amended its food labeling laws in 1995 in response to the federal implementation of the 1993 Nutrition Labeling and Education Act, California's regulations of food labels predate the enactment of the Sherman Law. For example, the current Cal. Health & Safety Code § 110660 invoked herein states "[a]ny food is misbranded if its labeling is false or misleading in any particular." California originally enacted this regulation in 1939, previously found at Cal. Health & Safety Code § 26490. *See People v. 748 Cases of Life Saver Candy Drops*, 94 Cal. App. 2d 599, 607 (1949) (applying section 26490 prohibition on "labeling is false or misleading in any particular" in food labeling claim in 1949).

29.     Under the FDCA, the term "misleading" covers labels that are technically true, but are likely to deceive consumers. Under the FDCA, if any single representation on the labeling is misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

30.     Further in addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific numerated federal food laws and regulations. *See* California Health & Safety Code § 110660 (misbranded if label is misleading).

31.     Under California law, a food product that is "misbranded" cannot legally be manufactured, advertised, distributed, sold, or possessed. Misbranded products have no economic value and are legally worthless.

32.     Representing that the Products will provide certain health benefits by making unlawful nutrient content claims as Defendant's labels do is prohibited by the aforementioned misbranding laws and regulations.

33.     The regulations relating to nutrient content claims discussed herein are intended to ensure that consumers are not misled as to the actual or relative nutritional value of food products.

**Defendant's Marketing and Labeling of the Products Violates State and Federal Food Labeling Laws**

**The Labels Are Unlawful**

34.    The Products are unlawful and violate the Sherman Law, California Health & Safety Code § 110660, *et seq.*, because the Products are intended for children less than 2 years of age and the Products' labels contain nutrient content claims.

35.    As described above, the Products at issue in this case are intended for children 6 months and up as evidenced on the front labels and in the Product titles.

36.    Beyond the Product labels, the Products are also sold in the "Baby Food" grocery store aisles, alongside similar puree pouch products. On information and belief, Defendant directs retailers to sell the Products in the baby food aisle.

37.    Defendant makes nutrient content claims that are strictly prohibited by the FDA regulations, which are incorporated into the California Sherman Law.

38.    All the Product labels contain nutrient content claims that are unlawful. As shown in **Exhibit A**, the Product labels prominently state nutrient content claims on the front label such as "2g of Protein." The grams of protein appear in the nutrition facts panel and is therefore a nutrient content claim when stated elsewhere on the label. 21 C.F.R. § 101.13(c). The statement of the presence of other nutrients are also express nutrient content claims because it is a direct statement about the level of a nutrient in the product. *See* 21 C.F.R. § 101.13(b)(1).

39.    Some Products also include implied nutrient content claims. For example, the "Plant-tastic" pouches state: "Nutritious, plant-based, and specially designed to provide 2 grams of protein." The explicit statement about protein in conjunction with the term "nutritious" is an implied nutrient content claim. *See* 21 C.F.R. § 101.13(b)(2); *FDA, Guidance for Industry: A Labeling Guide for Restaurants and Other Retail Establishments Selling Away-From-Home Foods*, 2008 WL 2155726, at *10 (April 2008) (explicit statement about a nutrient alongside synonyms of healthy, including "nutritious," are implied nutrient content claims).

40.    Other Products make claims like "1 ½ servings of fruit" or "2 servings of superfoods." This suggests that nutrients like fiber and vitamins are present in a certain amount. Fruits and vegetables are associated with fiber and vitamins. And "superfood" is an industry term to denote nutrient-dense foods, synonymous with "healthy" and "nutritious."

41.     Foods intended for children less than two are prohibited from making such nutrient content claims. 21 C.F.R. § 101.13(b)(3). Therefore, the Products are accordingly unlawfully labeled.

**The Product Labels Are Misleading.**

42.     In addition to being unlawful, the claims on the Products are also separately misleading.

43.     Reasonable consumers rely on the label claims to decide to purchase the Products for children well under two years old. Reasonable consumers shopping in the baby food aisle of a grocery or online retailer see the Products alongside products intended for children as young as six months and purchase the Products for their baby or toddler under the age of two.

44.     The claims on the Products mislead reasonable consumers into believing the Products will be healthy for their children, when in fact the Products are harmful.

45.     Gerber intends that consumers rely on the label claims to believe the Products are healthy. For example, the Gerber website advertises the "Lil' Crunchies" with an image that states "make snack time NUTRITIOUS" followed by the nutrient content claims and other claims on the label including "2G OF WHOLE GRAINS PER SERVING."[1] The Pasta Pick-Ups and Mealtime for Toddler websites state "wholesome nutrition with none of the hassle!"[2] The Pasta Pick Ups and Mealtime for Toddler websites also advertise the Products as being "The Good Stuff, Details on the things that matter to you and your baby" followed by a listing of the front of package claims including protein claims, "farm-grown veggies" claims, and "no preservatives."[3]

46.     Reasonable consumers will believe the Products are healthy because they rely on the at-issue claims in the context of the labels as a whole, which feature prominent photos of

---

[1] *See*, *e.g.*, https://www.gerber.com/gerber-snacks-lil-crunchies-mild-cheddar (last accessed September 5, 2024).
[2] *See*, *e.g.*, Chicken Carrot Ravioli Pasta Pick-Ups, https://www.gerber.com/simply-pick-upstm-chicken-carrot-ravioli (last accessed September 5, 2024); Mealtime for Toddler Mashed Potatoes & Gravy with Roasted Chicken, https://www.gerber.com/mashed-potatoes-gravy-with-roasted-chicken (last accessed September 5, 2024).
[3] *See id*.

whole fruits and vegetables alongside claims such as "big nutrition," "nutritious foods," and the claims at issue, as outlined in Exhibit A.

47.     The Products, however, do not meet nutritional standards for children under two and are harmful for their development.

48.     Children under two have unique dietary needs because they are experiencing huge amounts of growth, but eating relatively little solid food. Therefore, it is important that children under two receive the "most nutrient dense foods available in the household." Dewey KG. *The challenge of meeting nutrient needs of infants and young children during the period of complementary feeding: an evolutionary perspective.* J Nutr. 2013 Dec;143(12):2050-4. doi: 10.3945/jn.113.182527. Epub 2013 Oct 16. PMID: 24132575; PMCID: PMC3827643.

49.     Dietary needs for children under two are also different from those of adults because the optimal diet for children under two also has to address needs beyond mere nutrition, such as developing neural pathways in the brain to establish healthy eating habits and developing gross and fine motor skills. The USDA-recommended diet for children under two includes nutrient-dense foods that promote exposure to new flavors and textures. Dietary Guidelines for Americans, 2020-2025. 9th Edition. December 2020. Available at DietaryGuidelines.gov (hereinafter "DGA"). The DGA emphasize that the period of 0-24 months "is key for establishing healthy dietary patterns that may influence the trajectory of eating behaviors and health throughout the life course. . . . Children in this age group consume small quantities of foods, so it's important to make every bite count!" DGA at 53. By making nutrient content claims on its packages' front labels, Defendant misleads consumers into believing that foods for children under two should be purchased based on the quantities of the listed nutrients, when other considerations are just as, or more, important.

50.     For example, research shows that "[i]f early experience includes exposure to a variety of foods and flavors, then a wider range of foods and flavors will be accepted. If not, the

diets of young children will likely continue to be dominated by sweet or salty foods that are readily accepted without familiarization."[4]

51.     As a spokeswoman for the American Academy of Pediatrics said in 2018 of the overuse of baby food pouches, "Parents are feeling reassured that their kids are getting the fruits and vegetables . . . [but] kids need the taste of what the actual food is to come to like it later."[5]

52.     Globally, the World Health Organization (WHO) has a Department of Nutrition and Food Safety (NFS).[6] In collaboration with the Food and Agriculture Organization of the United Nations (FAO), the WHO continually reviews new research and information from around the world on human nutrient requirements and recommended nutrient intakes.

53.     In 2022, the WHO developed a nutrition and promotion profile model ("NPPM") to ensure that appropriate products with suitable, clear promotional materials are available for children ages 6 months to 3 years.[7]

54.     In the NPPM, the WHO sought to address a number of concerns about the "suitability and marketing of" food products for infants and young children, including:

- High total sugar content and sweet taste profile;

- Addition of salt or high sodium content;

- Low nutrient or energy density in purees aimed at younger ages/early weaning;

- Marketing of very smooth/pureed foods beyond 12 months of age despite the facts that:

    o   Introduction of texture is important for chewing development;

    o   Most infants can accept textured foods from 12 months; and

---

[4] Birch LL, Doub AE. Learning to eat: birth to age 2 years. Am J Clin Nutr. 2014;99:723S-7285. doi: 10.3945/ajcn.113.069047.
[5] Rachel Cernansky, "Rethinking Baby Food Pouches," New York Times, June 19, 2018, available at https://www.nytimes.com/2018/06/19/well/rethinking-baby-food-pouches.html.
[6] *See* WHO, Nutrition and Safety, https://www.who.int/teams/nutrition-and-food-safety/safe-healthy-and-sustainable-diets.
[7] WHO Nutrient and Promotion Profile Model. 21 November 2022. Available at https://www.who.int/europe/publications/i/item/WHO-EURO-2022-6681-46447-67287. (Hereinafter "NPPM").

- Ongoing exposure to purees, with high liberated sugar content is a concern for oral health and development of sweet taste preference;

- Misleading product names which imply vegetable or savory flavors, or high dairy, vegetable or cereal content, but contains high fruit content and sweet taste;

- Proliferation of marketing messages, including health and nutritional claims, that:

   - Undermine public health messages such as the age of food introduction, the importance of increasing textures and food variety, and limiting snack food use;

   - Undermine confidence or displace home-prepared foods;

   - Imply that features of the product are desirable or advantageous (such as "fits into little fingers", "no bits", "full of goodness" and "organic" etc.).[8]

55.     According to the WHO, foods for infants and young children "rely on the consumer assumption that they are specifically formulated and are healthier and superior to other commercial products for older children or adults. Many promotional messages and claims are designed to mislead or distract consumers from undesirable qualities, for example by emphasizing use of organic ingredients, convenience, taste or smooth texture."[9]

56.     All of Defendant's Products exceed the recommended limits of sugar (both free and/or added) and/or sodium in food products for infants and young children. They also contain much of the marketing the WHO warns against because it will mislead consumers, and promote the use of purees beyond the age of 12 months. Thus, as explained further herein, consumers are misled by the Product labeling that suggests the Products are healthy for children under the age of two.

### The Amount of Free and Added Sugar in the Products Is Harmful

57.     The impact of sugar from whole fruits is different than the impact of pureed fruits on the body. "Liberated sugars are defined as those that are released or 'liberated' from within

---

[8] NPPM at 2.
[9] NPPM at 22.

1    plant cell walls during processing such as heat-treatment, maceration or puréeing. Liberated

2    sugars have the same function as free sugars in terms of contributing to the sweet taste of foods

3    and the speed at which sugars are absorbed into the blood stream. For example, fruit purée is

4    particularly high in liberated sugar. Feeding fruit purée alone, or using it as an ingredient in other

5    foods, means foods taste very sweet and blood sugar levels can rise rapidly."[10]

6          58.    This concept is also known as the "food matrix" of a food, which is defined by the

7    USDA as "the nutrient and non-nutrient components of foods and their molecular relationships,

8    i.e., chemical bonds, to each other."[11] The effect of the food matrix is that two foods of identical

9    chemical composition, but with different structures, may have significantly different outcomes

10   for health.

11         59.    Total sugar content is important to consider because it skews the energy density

12   of low nutrient foods. The WHO recommends limiting total sugar intake, defined as "any

13   intrinsic sugars contained within plant cell walls, liberated sugars, free sugars, and sugars

14   naturally present in milk (largely lactose)".[12] Specifically the WHO recommends that products

15   that have more than 30% of the energy from sugar carry a front-of-pack warning label to help

16   consumers make healthier choices.[13] The energy intake from sugar can be determined according

17   to the following formula:

18   (total sugar grams per specified product weight ÷ kcal per specified product weight) x 400.[14]

19         60.    The Product chart attached to the SAC outlines the percent energy from sugar for

20   each Product. Every single pouch Product has a sugar density above 30%, which is the level at

21   which the WHO recommends a front-of-pack "indicator label" for products intended for infants

22   and toddlers because of the health risks associated with that level of sugar.[15] The Wonderfoods

---

25   [10] NPPM at 5.

26   [11] https://agclass.nal.usda.gov/vocabularies/nalt/concept?uri=https://lod.nal.usda.gov/nalt/17238
     [12] WHO Guideline 2015: Sugars Intake for Adults and Children. Geneva: World Health

27   Organization; 2015. PMID: 25905159. ISBN: 978-92-4-154902-8; NPPM at 14.
     [13] NPPM at 19.

28   [14] NPPM at 10.
     [15] NPPM at 19.

pouch Products all contain over 50% of energy from sugar, with the Banana Wonderfoods pouch having 89% of the energy from sugar, while touting "2 servings of superfoods." Ex. A, Prods. 6-11. "Superfood" is a term used to denote nutrient-dense foods, synonymous with "healthy" and "nutritious."[16] The Wonderfoods pouches also claim to "awaken toddler's love for nutritious foods," and that the superfoods are "nutrient-dense." However, the high sugar profile will encourage a preference for sweeter foods that contribute to noncommunicable diseases and obesity, contribute to dental decay, cause spikes in blood sugar, and can lead to picky eating.

61.     The Veggie Power pouch Products range from 47%-67% of energy from sugar. Ex. A, Prods. 13-17. Despite the product line being named "veggie" and the front label touting the number of servings of vegetables, all but one pouch includes sweet fruit purées that mask the taste of the advertised vegetable. *See*, *id*. The back label of the Products advertises that the pouches "encourage baby's love for veggies" and "love for veggies to delight baby's tastebuds," further leading consumers to believe the Products are healthy. *See*, *id*. However, because of the sweet fruit ingredients and the amount of total sugar, the Products will do little to "encourage baby's love for veggies." Indeed, these types of marketing claims are among the exact types of claims the WHO recommends prohibiting to avoid misleading consumers or distracting them from undesirable qualities.[17] Thus, the Products are not healthy and will encourage a preference for sweeter foods that contribute to noncommunicable diseases and obesity, contribute to dental decay, cause spikes in blood sugar, and can lead to picky eating.

62.     Similarly, the "Plant-tastic" pouch Products are high in sugar, ranging between 34%-46% of energy from sugar. Ex. A, Prods. 1-4.

---

[16] *See* Oxford Online American English Dictionary, available at https://www.oed.com/search/dictionary/?scope=Entries&q=superfood (last accessed Sept. 6, 2024) (defining "superfood" as a food considered especially nutritious or otherwise beneficial to health and well-being); *see also Jones v. Nutiva, Inc*., No. 16-cv-00711-HSG, 2017 U.S. Dist. LEXIS 135388, at *8-9 (N.D. Cal. Aug. 23, 2017)
[17] NPPM at 14, Table 3, 22.

63.     While the "Plant-tastic" pouch Products advertise "2 grams of Plant Protein," and "nutritious, plant-based, and specially designed to provide 2 grams of protein," the Products do not carry the flavor profile of plant-based protein ingredients such as chickpeas, navy beans, or black beans. Consumers perceive plant-based products to be healthier, and plant-based marketing has taken off to capture these consumers' interest in healthy products.[18] Although the Products claim to be "specially designed to provide 2 grams of protein," the Products do not in fact provide 2 grams of protein because of the PDCAAS of the plant proteins in the Products is low. The Nutrition Facts Panel reveals the Products provide 10-11% of the daily value of protein. This means that the Products only provide 1.3-1.4 grams of protein. (%DV is calculated as 10% and 11% of 13 grams of protein, which is the DRV for protein for children 1-3 years old. 21 C.F.R. § 101.9) As with the other Products, the sugar content is too high for children under two and will encourage a preference for sweeter foods that contribute to noncommunicable diseases and obesity, contribute to dental decay, cause spikes in blood sugar, and can lead to picky eating.

64.     The Grow Strong pouch products also exceed the threshold established by the WHO, ranging in 40-50% energy from sugar. Ex. A, Prods. 34, 35. The Products promise to "support[] toddler's healthy growth" but instead will encourage a preference for sweeter foods that contribute to noncommunicable diseases and obesity, contribute to dental decay, cause spikes in blood sugar, and can lead to picky eating. Notably, the first ingredient in the Grow Strong products is not yogurt, which is the source of protein and calcium that is advertised on the front label, but instead is fruit. Thus, the label claims such as "2 grams of Protein," "Grow Strong," "Raising the delight of dairy," and "supports toddler's healthy growth" will all mislead to believe the Products are healthy for a child under two and distract consumers from the undesirable sugar levels.

---

[18] *Consumers Perceive Plant-Based Foods To Be Healthier, Even When They Compare Labels*, https://www.forbes.com/sites/jennysplitter/2020/01/30/consumers-perceive-plant-based-foods-to-be-healthier-even-when-they-compare-labels/ (last accessed September 6, 2024).

65.     The DGA also recommend that children "younger than age 2" completely "[a]void foods and beverages with added sugars." DGA at 61. Some Products have high amounts of added sugars. For example, the Spaghetti Rings in Meat Sauce have 3 grams added sugar, the Fruit & Yogurt Strawberry Banana pouch has 5 grams added sugar, and the Grain & Grow bars have 4 grams of added sugar. *See* Ex. A.

### *The Pouch Format of Pureed Foods Is Not Recommended*

66.     The DGA recognize that it is not just *what* infants and toddlers are fed, but *how* they are fed, that matters. While some parents begin exposure to solids through the use of purees, purees are not recommended for long-term use because children under two are at a crucial stage of feeding and oral development. Learning to chew and swallow soft foods helps develop speech and multi-sensory experiences that contribute to a palate for a wide range of foods later in life.

67.     Indeed, experts have cautioned that relying on pouches like Defendant's Products too much can be a "gateway to bad long-term snacking habits and routine overeating."[19]

68.     The World Health Organization has also recognized the dangers inherent in pouch products. Recognizing that "[p]ureeing foods means much of the intrinsic sugar (within cell walls of fruit and vegetables) is liberated and readily available," the WHO—while endorsing the consumption of whole fruits and vegetables—has stated that "pureed foods" "sold in pouches with spouts present[] several issues[,]" including "exposure to high concentrations of free sugars that may quickly be absorbed," "lower nutrient density," and "issues with sucking directly from the pouches," such as "t[oo]th decay" from "sucking these [sugary] foods across the teeth."[20]

69.     "In addition, feeding experiences with foods provided in different textures and forms (such as 'finger foods') help to develop manual dexterity, hand-eye coordination, and

---

[19] *Id.*

[20] World Health Organization, "Ending inappropriate promotion of commercially available complementary foods for infants and young children between 6 and 36 months in Europe (2019)" available at https://www.euro.who.int/en/health-topics/disease-prevention/nutrition/publications/2019/ending-inappropriate-promotion-of-commercially-available-complementary-foods-for-infants-and-young-children-between-6-and-36-months-in-europe-2019. (Hereinafter "WHO 2019, Ending inappropriate promotion")

dexterity of the tongue and other mechanical features involved in chewing and swallowing. The timely introduction and progression of textures helps to support the development of appropriate feeding and eating behaviors during childhood." 2020 Scientific Report, Part D. Ch. 7.

70.    The WHO cautions that pouches are not recommended because "sucking from a pouch does not encourage the learning of, and use of, chewing skills; children cannot distinguish what it is they are eating, and cannot see or smell the food easily; children who are given smooth foods in pouches for longer periods may become fussier eaters; children develop fine motor skills when picking up food or playing with it; pureed fruit and vegetables in pouches are high in free sugars, and sucking these foods across the teeth may contribute to tooth decay; there is no portion control if food is eaten directly from the pouch; and there may be considerable food waste."[21]

71.    A baby consuming a pouch is also more likely to eat more puree than when she is fed with a spoon. This is problematic in at least two ways: 1) babies are less likely to recognize satiety cues which can contribute to long term health risks; and 2) babies are filling up on purees which are "not good nutritional substitutes for breastmilk or formula in early life", according to the chair of the American Academy of Pediatrics' Committee on Nutrition.[22]

72.    Purees should be timebound in the diet of infants and young children. Children over 12 months should not continue to consume purees. "[W]ith increasing age and the development of fine and gross motor skills, infants or young children do not need such smooth foods and can accept greater exposure to textured foods. This further develops chewing ability and children can become accustomed to home-style and family foods. Furthermore, ongoing exposure to highly macerated fruits and vegetables in purees increases unnecessary exposure to liberated sugars in products, presenting issues such as blood glucose rises, oral health and the

---

[21] WHO 2019, Ending inappropriate promotion, at 48.
[22] *Id.*

development of sweet-taste preference. Pureeing also changes food flavor and appearance and may lead to overeating, as foods can rapidly be swallowed without chewing."[23]

73.     Some professionals have noted delays in motor development among kids overly dependent on pouches.[24]

### The Sodium Levels in Defendant's Products Are Harmful.

74.     The DGA recommend choosing foods with less sodium given the increased risk of cardiovascular diseases and hypertension. DGA at 13, 17, 18, 20, 22, 30, 37, 46. The USDA recommends that "[c]omplementary foods [for infants] should be rich in nutrients, meet calorie and nutrient requirements during this critical period of growth and development, and stay within limits of dietary components such as added sugars and sodium." DGA at 59.

75.     The DGA explicitly notes that "[s]odium is found in a number of foods, including some salty snacks, commercial toddler foods, and processed meats." DGA at 61. The DGA notes that it's not only the desire to limit sodium for health, but also "another reason to avoid high-sodium foods is that taste preferences for salty food may be established early in life. Choose fresh or low-sodium frozen foods, when available, and low-sodium canned foods to minimize sodium content." DGA at 61.

76.     The reasons for not adding salt to supplementary food for infants are that it "may damage the developing kidney[s]," "may pre-dispose to high blood pressure" "make them prefer salty food later in life" and "food contains enough sodium to meet the physiological needs of children during this period".[25]

77.     In its NPPM, the WHO recommends limits of 50mg of sodium per 100g of food.[26] The reason for the limit is not only because of the health impact of salt, but also "to prevent

---

[23] NPPM at 21.

[24] Alice Callahan, "The Truth About Food Pouches," New York Times, April 17, 2020, available at https://www.nytimes.com/2020/04/17/parenting/baby-food-pouches.html.

[25] S Yang , H Wang, Avoidance of added salt for 6-12-month-old infants: A narrative review Archives de Pédiatrie , volume 30 , p. 595 - 599 Posted: 2023

[26] WHO 2019, Ending inappropriate promotion; NPPM.

children becoming accustomed to a diet with high salt content."[27] Put differently, the recommendation not only considers to daily intake of sodium, but the density or "saltiness" of foods that are being consumed.

78.     Defendant's snack and mealtime Products all exceed the WHO recommended limit for mg of sodium per 100g of food.

79.     For example, the mealtime Products range in 109mg-224mg sodium per 100g of the Products, well above the 50mg per 100g recommended limit. *See* Ex. A. Each Product has salt as an ingredient. It is not just the high amount of sodium in each Product that is too high for a child's developing kidneys, but the density of salt that creates a salty taste profile that will affect children's food preferences for the rest of their lives. Thus, the label claims including quantitative protein claims, servings of "veggies" claims, and claims that the products are "made with your little one's nutrition and feeding skills in mind" or are "nutritious, plant-based, and specially designed to provide 3 grams of protein" mislead consumers to believe the products are healthy despite the high sodium content that will harm their child's health.

80.     The "Lil' Sticks" meat products are essentially glorified hotdogs. The chicken sticks have 268mg sodium per 100g and the turkey sticks have 296mg sodium per 100g. The Products boast "9g protein per serving" to entice consumers to increase protein in a child's diet, despite no evidence that a high protein diet would be recommended. And, the protein claim only serves to deceive consumers and distract them from the high sodium content that will harm their child's kidneys and create a preference for salty foods with negative health impacts such as cardiovascular disease. The meat products are highly processed salty foods that are not recommended for children under two.

81.     Finally, the worst offender is the "Lil' Crunchies" snack products ranging in 71mg sodium per 100g to 500mg sodium per 100g. These Products claim to be for children 8+ months, and include claims that the Products include "2g of whole grains," advertise that the

---

[27] WHO 2019, Ending inappropriate promotion, at 30.

SECOND AMENDED CLASS ACTION COMPLAINT

Products are "made with whole grain sorghum just for your little one," and are "perfectly sized pieces, easy to pick up, and help develop baby's pincer grasp for self-feeding." As recognized by the WHO, these types of claims "give the impression of being optimum foods" and "imply superiority over other foods" which makes it "challenging to identify healthy products form the many on the market."[28] "Adding statements related to the nutritional content or quality of the ingredients may also imply superiority over home-prepared foods."[29] But the Products exceed the recommended sodium limits by a factor of 100, which will harm infants' kidneys and cause infants to develop a taste profile that negatively impacts current and future health. Thus, consumers will be misled to believe that because of the whole grain content and intention of being fed to infants, the Products will be healthy for children under two. In fact, the Products contain sodium levels that are extreme and harmful to children under two.

82.    For these reasons, Defendant's marketing of the Products as providing physical health benefits for babies and toddlers being a healthful and safe source of nutrients for babies and toddlers is misleading to reasonable consumers. The labels take advantage of parents' and caregivers' desires to give infants and young children nutritious food with the advertised vitamins, minerals, and macronutrients, leading them to believe the products are healthy, children need more of the advertised nutritional content, and distracting consumers from the undesirable nutritional qualities of the Products. The Products are actually harmful for children under two both nutritionally and developmentally because of the sugar content, the pouch format, and the sodium content of the foods.

83.    Defendant's marketing, advertising, and sale of the Products violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et. seq.*), including but not limited to:

   a.    Section 110390, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product

---

[28] WHO 2019, Ending inappropriate promotion at 55.
[29] *Id*. at 56.

packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;

b.    Section 110395, which makes it unlawful to manufacture, sell, deliver, hold, or offer to sell any falsely or misleadingly advertised food; and

c.    Sections 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised.

84.    Defendant's marketing, advertising, and sale of the Products violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et. seq.*), including but not limited to:

a.    Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

b.    Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

c.    Section 110765, which makes it unlawful for any person to misbrand any food; and

d.    Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

85.    Defendant has violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including, but not limited to, 21 C.F.R. §§ 101.13(b), and 101.13(c), which have been incorporated by reference in the Sherman Law, by including impermissible nutrient content claims on the labels of foods intended for children less than 2 years of age, and including misleading claims on the labels.

86.    A reasonable consumer would rely on the label claims to decide to purchase the Products. For example, Defendant's nutrient content claims mislead a reasonable consumer to believe the Products provide physical health benefits for their child and/or grandchild when in fact, the Products are harmful for children under two both nutritionally and developmentally.

87.     Defendant intends for and knows that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendant has done on the Product labels.

88.     Because consumers pay a price premium for Products that have a nutrient content claim, by labeling the Products as providing nutritional value, Defendant is able to both increase its sales and retain more profits.

89.     Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of its Products while decreasing the sales of competitors' products that do not make unlawful nutrient content claims, and/or (ii) commanding a higher price for the Products because consumers will pay more for them due to consumers' demand for healthful products for their children.

90.     The market for baby food pouch products continues to grow, and because Defendant knows consumers rely on the nutrient content claims on the Product labels, Defendant has an incentive to continue to make such misleading and unlawful representations.

91.     Defendant continues to launch new product lines with nutrient content claims to maintain its competitive edge, making it likely that Defendant will continue to misleadingly advertise its Products.

## V.     PLAINTIFFS' EXPERIENCES

**Plaintiff Tracy Howard**

Starting in or around 2021, Plaintiff Howard purchased Gerber Products for her child starting when her child was under 2 years of age, including at least each of the following varieties:

- Strong, Pear, Sweet Potato, Greek Yogurt, Oats, and Cinnamon Pouch
- Organic for Toddlers, Plant-Tastic Pouch Southwestern Fiesta Fruit & Veggie Bean Smash
- Organic for Toddlers, Plant-Tastic Pouch Summer Fruit & Veggie Smash
- Mealtime for Toddler, Creamy Chicken Stew
- Mealtime for Toddler, Mashed Potatoes & Gravy with Roasted Chicken
- Mealtime for Toddler, Macaroni & Cheese
- Mealtime for Toddler, Pasta Stars in Meat Sauce

- Mealtime for Toddler, Pasta Stars with Chicken & Vegetables
- Lil' Crunchies, Veggie Dip
- Lil' Crunchies, Apple Sweet Potato

92.    Plaintiff Howard purchased the Products from Safeway in Mountain View, California, and Walmart in Redwood City, California.

93.    Plaintiff Howard made each of her purchases after reading the nutrient content claims on the Product labels, including, for example, "2g Protein" on the Strong Pear, Sweet Potato, Greek Yogurt, Oats, and Cinnamon pouch. She purchased the Products instead of other products, because she believed the Products were healthy, superior, and appropriate in providing nutrition for her child.

94.    As a result of Defendant's unlawful and misleading nutrient content claims, the Products have no, or at a minimum, a much lower value to Plaintiff Howard.

95.    Plaintiff Howard not only purchased the Products because the labels contained nutrient content claims, but she also paid more money for the Products than she would have paid for them if they did not contain nutrient content claims.

96.    Had Defendant not unlawfully and misleadingly labeled the Products, Plaintiff Howard would not have purchased them or, at a very minimum, she would have paid less for the Products.

97.    Plaintiff Howard continues to desire to purchase the Products, including those marketed and sold by Defendant. If the Products did not contain unlawful, deceptive, and misleading labels, Plaintiff Howard would likely purchase the Products again in the future. Plaintiff Howard regularly shops at stores and online retailers where the Products and other baby food products are sold.

**Plaintiff Eri Noguchi**

75.    Starting in or around 2021, Plaintiff Noguchi purchased Gerber Products for her child starting when her child was under 2 years of age, including at least each of the following varieties: Organic for Toddlers, Plant-tastic Pouch Banana Berry & Veggie Smash with Oats; Natural for Toddler, Wonderfoods Banana Blueberry with Vitamin C; Natural for Toddler, Apple Pear Peach with Vitamin C & E; Snacks for Baby, Wonderfoods Superfoods Hearts; and Lil'

Crunchies Ranch.

98.     Plaintiff Noguchi purchased the Products on multiple occasions from Target, Safeway, and Raley's in Tracy, California.

99.     Plaintiff Noguchi made each of her purchases after reading the nutrient content claims on the Product labels, including, for example, "2 grams Plant Protein" and "Nutritious, plant-based, and specially designed to provide to provide 2 grams of protein" on the Organic for Toddlers Plant-tastic Pouch Banana Berry & Veggie Smash with Oats. She purchased the Products because she believed the Products were healthy, superior, and appropriate in providing nutrition for her child under two.

100.    As a result of Defendant's unlawful and misleading nutrient content claims, the Products have no, or at a minimum, a much lower value to Plaintiff Noguchi.

101.    Plaintiff Noguchi not only purchased the Products because the labels contained nutrient content claims, but she also paid more money for the Products than she would have paid for them if they did not contain nutrient content claims.

102.    Had Defendant not unlawfully and misleadingly labeled the Products, Plaintiff Noguchi would not have purchased them or, at a very minimum, she would have paid less for the Products.

103.    Plaintiff Noguchi continues to desire to purchase the Products, including those marketed and sold by Defendant. If the Products did not contain unlawful, deceptive, and misleading labels, Plaintiff Noguchi would likely purchase the Products again in the future. Plaintiff Noguchi regularly shops at stores and online retailers where the Products and other baby food products are sold.

**Plaintiff Scott Dias**

76.     Starting in or around 2022, Plaintiff Dias purchased Gerber Products for his grandchild starting when his grandchild was under 2 years of age, including at least each of the following varieties: Organic for Toddlers, Plant-tastic Pouch Banana Berry & Veggie Smash; Organic for Toddlers, Plant-tastic Pouch Sweet Potato Cherry Smash; Organic for Toddlers, Wonderfoods Pouch Banana Strawberry Beet Oatmeal; Natural for Toddler, Wonderfoods Pouch

Banana Blueberry *with Vitamin C; and Natural for Baby, Wonderfoods Pouch Banana *with Vitamin C.

104.    Plaintiff Dias purchased the Products on multiple occasions from a Holiday Market in Weaverville, California and Safeway in Redding, California.

105.    Plaintiff Dias made each of his purchases after reading the nutrient content claims on the Product labels, including, for example, "2 grams of Plant Protein" on the Plant-tastic Pouch Banana Berry & Veggie Smash. He purchased the Products instead of other products, because he believed the Products were healthy, superior, and appropriate in providing nutrition for his grandchild.

106.    As a result of Defendant's unlawful and misleading nutrient content claims, the Products have no, or at a minimum, a much lower value to Plaintiff Dias.

107.    Plaintiff Dias not only purchased the Products because the labels contained nutrient content claims, but he also paid more money for the Products than he would have paid for them if they did not contain nutrient content claims.

108.    Had Defendant not unlawfully and misleadingly labeled the Products, Plaintiff Dias would not have purchased them or, at a very minimum, he would have paid less for the Products.

109.    Plaintiff Dias continues to desire to purchase the Products, including those marketed and sold by Defendant. If the Products did not contain unlawful, deceptive, and misleading labels, Plaintiff Dias would likely purchase the Products again in the future. Plaintiff Dias regularly shops at stores and online retailers where the Products and other baby food products are sold.

# VI.   CLASS ALLEGATIONS

110.     Plaintiffs bring this class action lawsuit on behalf of themselves and a proposed class and subclass of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

Class:                                 All persons in the State of California who purchased the Products between August 19, 2018 and the present.

Fraud Sugar Pouch Subclass: All persons who purchased pouch products for children under two between August 19, 208 and the present, as identified in Exhibit A.[30]

Fraud Sodium Subclass:        All persons who purchased snack and meal products for children under two between August 19, 2018 and the present, as identified in Exhibit A.

111.     This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

112.     Numerosity: Plaintiffs do not know the exact size the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

113.     Common Questions Predominate: This action involves common questions of law and fact to the Class because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led them to rely on the unlawful nutrient content claims on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

---

[30] Excluded products from the subclass are: Organic for Toddlers Banana Raspberry & Yogurt pouch; Organic for Baby Wonderfoods Carrot Apple Mango pouch; Natural for Toddler Sweet Potato, Mango, Pear & Kale pouch; Snacks for Toddler Fruit & Yogurt pouch.

a.      Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive and/or unlawful;

b.      Whether Defendant's actions violate Federal and California laws invoked herein;

c.      Whether labeling the Products with unlawful nutrient content claims causes the Products to command a price premium in the market as compared with similar products that do not make such unlawful claims;

d.      Whether Defendant's advertising and marketing regarding the Products was likely to deceive reasonable consumers;

e.      Whether representations regarding the nutrient content of the Products are material to a reasonable consumer;

f.      Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

g.      The amount of profits and revenues earned by Defendant as a result of the conduct;

h.      Whether class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

i.      Whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

114.    Typicality: Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each member of the Class were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

115.    Adequacy of Representation: Plaintiffs will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the class. By prevailing on their own claims,

Plaintiffs will establish Defendant's liability to all class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

116.    Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

117.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## VII.   CAUSES OF ACTION

Plaintiffs do not plead, and hereby disclaim, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiffs rely on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

### PLAINTIFFS' FIRST CAUSE OF ACTION
#### (Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq.*)
#### On Behalf of Themselves, the Class, and the Subclasses

118.   Plaintiffs reallege and incorporate the paragraphs of this Class Action Complaint as if set forth herein.

119.   Plaintiffs and other Subclass members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

120.   The Products that Plaintiffs (and other similarly situated Subclass members) purchased from Defendant were "goods" within the meaning of California Civil Code § 1761(a).

121.   Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

122.   Defendant's acts and practices, set forth in this Class Action Complaint, led Plaintiffs and other similarly situated consumers to falsely believe that the Products provide physical health benefits for their child and/or grandchild when in fact, the Products are harmful for children under two both nutritionally and developmentally. By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Defendant has violated, and continue to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), and § 1770(a)(8) of the CLRA. In violation of California Civil Code §1770(a)(2), Defendant's acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation of California Civil Code §1770(a)(5), Defendant's acts and practices constitute improper representations that the goods they sell have sponsorship, approval,

characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Defendant's acts and practices constitute improper representations that the goods it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Defendant has disparaged the goods, services, or business of another by false or misleading representation of fact.

123.    Plaintiffs request that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiffs and the other members of the Subclass will continue to suffer harm. Plaintiffs and those similarly situated have no adequate remedy at law to stop Defendant's continuing practices.

124.    Plaintiff Howard provided Defendant with notice and demand that Defendant correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Defendant failed to do so in that, among other things, it failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly, Plaintiffs seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated subclass members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendant's acts and practices.

125.    Plaintiffs also request that this Court award them costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## PLAINTIFFS' SECOND CAUSE OF ACTION
**(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
**On Behalf of Themselves, the Class, and the Subclasses**

126.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

127.    Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of the Class Action Complaint, Defendant made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

128.    Defendant made representations and statements (by omission and commission) that led reasonable customers to believe that the Products that they were purchasing were healthy for their young children.

129.    Plaintiffs and those similarly situated relied to their detriment on Defendant's misleading and deceptive advertising and marketing practices, including each of the unlawful and deceptive claims set forth above and the attached Exhibit A. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, refraining from purchasing the Products or paying less for them.

130.    Defendant's acts and omissions are likely to deceive reasonable consumers and the general public.

131.    Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

132.    The aforementioned practices, which Defendant used, and continue to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

133.    As a direct and proximate result of such actions, Plaintiffs and the other Subclass members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiffs, and those similarly situated, paid a price premium for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendant's false, deceptive and misleading advertising. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis. Alternatively, Plaintiffs and those similarly situated will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

134.   Plaintiffs seek equitable relief, including restitution, with respect to their FAL claims. Pursuant to Federal Rule of Civil Procedure 8(d)(2), Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action will not succeed. Plaintiffs and the Subclass may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiffs may not be able to establish each Subclass member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the FAL does not require individualize proof of deception or injury by absent class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'"). In addition, Plaintiffs and the Subclass may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiffs are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the FAL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

135.   Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

136.   Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they are not entitled. Plaintiffs, those similarly situated and/or other California consumers have no other adequate remedy at law

to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

### PLAINTIFFS' THIRD CAUSE OF ACTION
**(Common Law Fraud, Deceit and/or Misrepresentation)**
**On Behalf of Themselves, the Class, and the Subclasses**

137.    Plaintiffs reallege and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

138.    Defendant has fraudulently and deceptively included unlawful nutrient content claims on the Product labels.

139.    The unlawfulness and deceptiveness of the claims was known exclusively to, and actively concealed by, Defendant, not reasonably known to Plaintiffs, and material at the time they were made. Defendant's unlawful statements concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase the Products. In misleading Plaintiffs and not so informing them, Defendant breached its duty to Plaintiffs. Defendant also gained financially from, and as a result of, its breach.

140.    Plaintiffs and those similarly situated relied to their detriment on Defendant's unlawful representations. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of them, or (iii) paying less for the Products.

141.    By and through such fraud, deceit, and unlawful representations, Defendant intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and those similarly situated to, without limitation, purchase the Products.

142.    Plaintiffs and those similarly situated justifiably and reasonably relied on Defendant's unlawful representations, and, accordingly, were damaged by Defendant.

143.    As a direct and proximate result of Defendant's unlawful representations, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

144.   Defendant's conduct as described herein was wilful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiffs and those similarly situated.

**PLAINTIFFS' FOURTH CAUSE OF ACTION**
**(Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq.*)**
**On Behalf of Themselves, the Class, and the Subclasses**

145.   Plaintiffs reallege and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

146.   Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendant has engaged, and continue to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the conduct outlined in this Complaint.

147.   Defendant has engaged, and continue to engage, in unfair practices as described herein, in violation of the Unfair Competition Law, California Business & Professions Code §§ 17200 *et seq.* (the "UCL"), by, without limitation, including unlawful nutrient content claims on the Product labels, and thereby selling Products that were not capable of being sold or held legally and which were legally worthless.

148.   Defendant has engaged, and continue to engage, in unlawful practices as described herein, in violation of the UCL, by, without limitation, violating the following laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110665, 110760, 110765, and 110770; and (v) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343, *et seq.* and FDA regulations, including but not limited to 21 C.F.R. §§ 101.13(b), and 101.13(c), which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

149.   Defendant has engaged, and continue to engage, in fraudulent practices as described herein, in violation of the UCL, by, without limitation, including deceptive nutrient

content claims and other labelling claims on the Product labels that misled consumers and thereby selling Products that were not capable of being sold or held legally and which were legally worthless.

150.    Plaintiffs and those similarly situated relied to their detriment on Defendant's unlawful, unfair, and fraudulent business practices. Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of the Products, or (iii) paying less for the Products.

151.    Defendant's acts and omissions are likely to deceive the general public.

152.    Defendant engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

153.    The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

154.    As a direct and proximate result of such actions, Plaintiffs and the other Class and Subclass members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiffs and those similarly situated paid a price premium for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendant's misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis. Alternatively, Plaintiffs and those similarly situated will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

155.    As a direct and proximate result of such actions, Defendant has enjoyed, and continue to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

156.    Plaintiffs seek, on behalf of themselves and those similarly situated, equitable relief, including restitution for the premium and/or the full price that they and others paid to Defendant as result of Defendant's conduct. Plaintiffs and the Class lack an adequate remedy at law to obtain such relief with respect to their "unfairness" claims in this UCL cause of action, because there is no cause of action at law for "unfair" conduct. Plaintiffs and the Class similarly lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of action because the Sherman Law (Articles 3 and 6) and the Federal laws and regulations referenced herein do not provide a direct cause of action, so Plaintiffs and the Class must allege those violations as predicate acts under the UCL to obtain relief.

157.    Plaintiffs also seek equitable relief, including restitution, with respect to their UCL unlawfulness claims for violations of the CLRA, FAL and their UCL "fraudulent" claims. Pursuant to Federal Rule of Civil Procedure 8(d)(2), Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. Plaintiffs, the Class, and the Subclass may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiffs may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class). In addition, Plaintiffs, the Class, and the Subclass may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiffs are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

158.     Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

159.     Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## PLAINTIFFS' FIFTH CAUSE OF ACTION
### (Unjust Enrichment)
### On Behalf of Themselves and the Class

160.     Plaintiffs reallege and incorporates by reference all paragraphs alleged herein.

161.     Plaintiffs and members of the Class members conferred a benefit on the Defendant by purchasing the Products.

162.     Defendant has been unjustly enriched in retaining the revenues from Plaintiffs' and Class Members' purchases of the Products, which retention is unjust and inequitable, because Defendant sold Products that were not capable of being sold or held legally and which were legally worthless. Plaintiffs paid a premium price for the Products.

163.     Because Defendant's retention of the non-gratuitous benefit conferred on them by Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution and nonrestitutionary disgorgement of profits to Plaintiffs and the Class members for its unjust enrichment, as ordered by the Court. Plaintiffs and those similarly situated have no adequate remedy at law to obtain this restitution.

164.    Plaintiffs, therefore, seek an order requiring Defendant to pay nonrestitutionay disgorgement of profits and make restitution to them and other members of the Class.

## VIII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, respectfully requests that the Court enter judgement against Defendant as follows:

A.    Certification of the proposed Class and Subclass, including appointment of Plaintiffs' counsel as class counsel;

B.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    An award of compensatory damages in an amount to be determined at trial;

D.    An award of statutory damages in an amount to be determined at trial;

E.    An award of punitive damages in an amount to be determined at trial;

F.    An award of treble damages;

G.    An award of restitution in an amount to be determined at trial;

H.    An award of nonrestitutionary disgorgement of profits in an amount to be determined at trial;

I.    An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

J.    For reasonable attorney's fees and the costs of suit incurred; and

K.    For such further relief as this Court may deem just and proper.

## IX.   <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demands a trial by jury.


DATED: September 6, 2024

**GUTRIDE SAFIER LLP**


*/s/ Hayley Reynolds/s/*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Hayley Reynolds (State Bar No. 306427)
  hayley@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 336-6545
Facsimile: (415) 449-6469

Attorneys for Plaintiffs